## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

GREG MCWILLIAMS,                    )
                                   )
            Plaintiff,              )
                                   )
v.                                 )        Case No. CIV-19-212-SPS
                                   )
MICHAEL DINAPOLI, in his individual, )
capacity, and BOARD OF COUNTY      )
COMMISSIONERS OF BRYAN             )
COUNTY,                            )
                                   )
            Defendants.             )

### OPINION AND ORDER

This case arises out of an encounter between Greg McWilliams and deputies from the Bryan County Sheriff's Office. The Plaintiff sued Deputy Michael DiNapoli, as well as the Board of County Commissioners of Bryan County ("Board). The Plaintiff has alleged a claim of excessive force pursuant to 42 U.S.C. § 1983 against Defendant DiNapoli, as well as a state law negligence claim as to the Board. Each of the Defendants filed a summary judgment motion, with Defendant DiNapoli asserting qualified immunity and the Board asserting that they are exempt from liability. For the reasons set forth below, the Court finds that both Defendant Michael DiNapoli's Motion for Summary Judgment and Supporting Brief [Docket No. 48], and Defendant Board of County Commissioners of Bryan County's Motion for Summary Judgment and Brief in Support [Docket No. 44] should be denied.

## I. Procedural History

On March 1, 2019, the Plaintiff filed this case in Oklahoma state court in Bryan County, Case No. 19-CJ-33, and the Board removed the case to this Court on July 4, 2019. *See* Docket Nos. 1-2.  Plaintiff alleged two causes of action in his Petition.  The first cause of action is raised as to Defendant DiNapoli, alleging unconstitutional use of excessive and unreasonable force pursuant to 42 U.S.C. § 1983.  The second cause of action is raised as to the Board, alleging an Oklahoma state law claim of negligence.  Both Defendants moved for summary judgment on September 14, 2020.  *See* Docket Nos. 44, 48.

## II. Law Applicable

Summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party must show the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), with the evidence taken in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute[.]"  Fed. R. Civ. P. 56(c).

## III. Factual Background

The undisputed facts of this case reflect that on May 26, 2018, Mr. Jay Raborn

visited the Plaintiff's house and invited the Plaintiff to ride in his golf cart to Newberry Creek Marina, and the Plaintiff accepted his invitation. *See* Docket No. 44, p. 7, ¶ 1.  The Plaintiff knew that the marina was owned by the Army Corps of Engineers and that it was leased to Mr. Jerry Current at that time. *Id.*, ¶ 2.  When the Plaintiff and Mr. Raborn arrived at the marina area, Mr. Current saw them and told them to leave because they were not supposed to be there with the golf cart. *Id.*, p. 8, ¶ 3.  The men refused, and Mr. Current called the Bryan County Sheriff's Office ("BCSO"). *Id.*  Defendant DiNapoli, a Deputy with the BCSO, responded to the call along with Deputy Trainee Justin Vawter. *Id.*, ¶ 4.

Upon arrival, Defendant DiNapoli went inside the store located at the marina to talk with Mr. Current, then went back outside to speak with Mr. Raborn and the Plaintiff, purportedly getting both sides of the story.  Defendant DiNapoli then returned to the store to speak with Mr. Current as to his authority around the marina.  Mr. Current apparently showed Defendant DiNapoli a lease agreement,[1] which led Defendant DiNapoli to believe that Mr. Current had the authority to ask the Plaintiff and Mr. Raborn to leave.  Defendant DiNapoli then went outside again to speak with them. *Id.*, p. 8, ¶ 5; Docket No. 48, ¶ 7-8.  Deputy Trainee Vawter remained with the Plaintiff and Mr. Raborn throughout.  Upon Defendant DiNapoli returning outside to speak with Mr. Raborn and the Plaintiff, Mr.

---

[1] The Plaintiff objects to any mention of the lease agreement or of Mr. Current enacting a permitting scheme for golf carts on the marina property, of which Mr. Raborn may or may not have been in violation. There is some evidence in the record to indicate that Mr. Raborn was aware that Mr. Current required a permit, that Mr. Raborn did not have a permit, and that Mr. Raborn specifically invited the Plaintiff and took his golf cart to the marina knowing he did not have a permit.  As the Plaintiff was a passenger in the golf cart, and not an owner of it, the Court declines to further discuss the permitting scheme at this stage of the litigation.  It is undisputed that Mr. Current objected to the presence of Mr. Raborn and the Plaintiff, and that he called the BCSO.  It is further undisputed that Defendant DiNapoli arrested the Plaintiff for assault, not trespassing.

Raborn backed out his golf cart from where he had been parked. The events following Defendant DiNapoli's second exit from the marina store were captured on video from a camera that appears to be affixed near the roof of the marina store, and which was submitted as an exhibit by multiple parties. *See* Docket Nos. 44, Ex 4 & 48, Ex. 9.

The video begins with Defendant DiNapoli and Deputy Trainee Vawter standing on the passenger side of Mr. Raborn's golf cart while it is parked in what appears to be a parking area in between two trees, and the men appear to speak to each other on the video for over a minute and a half. At approximately the 1:40 mark, the golf cart begins to move, and Mr. Raborn backs the golf cart out from the parking space. At that time, the Plaintiff was in the passenger seat of the golf cart, holding a cigarette in his right hand as he gripped the top of the golf cart. As the golf cart was in reverse with both the Plaintiff and Mr. Raborn in it, the video shows Defendant DiNapoli stepping toward the passenger side of the golf cart with his palm upraised, reaching toward it. *See* Docket No. 48, Ex. 9, 1:52-1:54. The parties differ on whether he "removed" or "knocked" the cigarette out of the Plaintiff's hand, but Defendant DiNapoli agrees that he "grabbed" it because he testified that he did not know why "[he] grabbed that." *See* Docket No. 48, Ex. 8, p. 11; Docket No. 48, Ex. 9, 1:55-1:57.

Upon grabbing the cigarette, Defendant DiNapoli can then be seen on video moving to the rear of the golf cart and all the way around almost to Mr. Raborn on the driver's side, then back toward the rear of the golf cart. At the same time, the Plaintiff exited the golf cart, yelling and moving toward Defendant DiNapoli and the rear of the golf cart where they met each other. As they are speaking, the Plaintiff can be seen placing his right hand

-4-

on his right hip then speaking with both hands. *See* Docket No. 48, Ex. 9, 2:03-2:05. After the Plaintiff exited the golf cart, Mr. Raborn stopped the golf cart and also got out, likewise moving to the rear of the golf cart to stand near (but not right next to) the Plaintiff and Defendant DiNapoli. At 2:22, the Plaintiff can be seen taking a step closer to Defendant DiNapoli, with both arms behind his back. Defendant DiNapoli took a step back and the Plaintiff followed, raising his right arm out and away from both of them. *See* Docket No. 48, Ex. 9, 2:26. The Plaintiff came to stand less than an arms' length distance from Defendant DiNapoli, and Defendant DiNapoli told the Plaintiff to either "get back" or that he was "in my face." The Plaintiff testified that he was "pretty close," and Deputy Vawter testified that they were "practically face-to-face."[2] The Plaintiff admits to yelling at Defendant DiNapoli and agrees that he did not back away during the conversation. At 2:38, Defendant DiNapoli then put his chin down, causing the brim of his hat to hit the Plaintiff's nose. Docket No. 48, Ex. 9, 2:38.

Following Defendant DiNapoli hitting the Plaintiff with his hat, the parties disagree about whether the Plaintiff "applied force" to Defendant DiNapoli's chest. Defendant DiNapoli stated in a June 12, 2018 interview with the OSBI that the Plaintiff knocked his hat sideways then struck him in the chest. *See* Docket No. 48, Ex. 11, p. 11. At that same interview, though, he also claimed loose cigarettes were rolling off the top of the golf cart

---

[2] The parties engage in much disagreement as to how to characterize the distance—or lack thereof—between the Plaintiff and Defendant DiNapoli, *e. g.*, "face-to-face," "conversational distance," "in [Defendant] DiNapoli's face." *See* Docket No. 44, p. 8, ¶ 9; 48, p. 15, ¶¶ 17-22; 62, pp. 10-11, ¶¶ 16-21. The video speaks for itself in that the two men were close enough that Defendant DiNapoli had only to move his chin downward in order for his hat to strike the Plaintiff's nose.

-5-

and he moved to grab them before they fell.  *Id.*  At his deposition, however, Defendant DiNapoli admitted to grabbing the cigarette out of the Plaintiff's hand (rather than attempting to catch loose cigarettes), and the video similarly supports that interpretation of events.  *See* Docket No. 48, Ex. 8, p. 10-11; Ex. 9, 1:54-1:56.  This leaves doubts as to Defendant DiNapoli's veracity when he claims to have been hit by the Plaintiff.  However, Deputy Trainee Vawter told the OSBI on June 8, 2018 both that Defendant DiNapoli *did* grab the cigarette out of the Plaintiff's hand *and* that Defendant DiNapoli hit the Plaintiff with his hat, but also that the Plaintiff then pushed Defendant DiNapoli away after the hat check.  *See* Docket No. 48, Ex. 12, p. 2.  The Plaintiff denies pushing or hitting Defendant DiNapoli in the chest.  It is unclear from the video whether the Plaintiff made any contact with, or "applied force," to Defendant DiNapoli's chest, although it *is clear* that Defendant DiNapoli continued advancing toward the Plaintiff from the moment he hit the Plaintiff with his hat until the Plaintiff was subdued on the ground.  *See* Docket No. 48, Ex. 9, 2:38-2:46.

After Defendant DiNapoli caused his hat to hit the Plaintiff, it *is* undisputed that within a second or two he began punching the Plaintiff with closed fists and took hold of him to take him to the ground.  Defendant DiNapoli then used a choke hold to restrain the Plaintiff, checked him for weapons, then handcuffed him.  *See* Docket No. 48, Ex. 9, 2:38-3:36.  During this time, Mr. Raborn stayed toward the rear of the golf cart and did not move to get involved.  Additionally, Deputy Trainee Vawter stayed out of the altercation.  Once he handcuffed the Plaintiff, Defendant DiNapoli stood him up and performed a pat-down search, then led him to be placed in a patrol vehicle.  *See* Docket No. 48, Ex. 9, 4:05-4:48.

-6-

The Plaintiff was taken to a hospital to have his injuries checked and was diagnosed with facial abrasions and abrasions to his arms, then prescribed Neosporin.  He was then cleared for incarceration and taken to the jail.  Docket No. 48, Ex. 2, p. 13, 164:8-21.  The Incident Report states that the Plaintiff was arrested for assaulting an officer using "personal weapons (hands, fists, feet)."  Docket No. 48, Ex. 17, pp. 1-2.

## Analysis

Defendant DiNapoli has moved for summary judgment, asserting that his use of force was objectively reasonable, and that he is entitled to qualified immunity.  The Plaintiff challenges the Defendant's assertion of qualified immunity here because he contends that the Defendant engaged in unconstitutional and excessive force in violation of clearly established law.  For the reasons set forth below, the Court finds that Defendant DiNapoli is not entitled to qualified immunity.

Additionally, the Board has moved for summary judgment, asserting that Defendant DiNapoli acted outside the scope of his employment and the Board is therefore not statutorily liable.  In response, the Plaintiff contends that Defendant DiNapoli's actions were within the scope of his employment, and moreover, such questions are reserved to the jury.  The Court finds that the Board is not entitled to summary judgment at this time, as discussed below.

### A.    Related Motions

As an initial matter, the Court notes that the parties have filed a number of motions related to the evidence submitted along with the pending motions for summary judgment. First, the Plaintiff has moved to strike portions of Defendant Dinapoli's motion for

summary judgment, asserting that Defendant DiNapoli's 3.5-page introduction was in violation of local rules requiring that the motion "begin with a section stating the material facts to which the movant contends no genuine dispute exists."  Loc. Civ. R. 56.1(b).  He further contends that Defendant DiNapoli relied on inadmissible evidence, and has moved to strike the following exhibits:  (i) an expert report from Tim Tipton (Docket No. 48, Ex. 15), (ii) an unsworn statement by Jerry Current (*Id.*, Ex. 3), and (iii) portions of the investigation reports (*Id.*, Exs. 5, 7, 14, 17).

The Defendants are correct that the general rule in the Tenth Circuit is that "motions, briefs, and memoranda may not be attacked by a motion to strike," except that a Court may "strike a filing that is not allowed by local rule, such as a surreply filed without leave of court."  *Ysais v. New Mexico Judicial Standard Com'n*, 616 F. Supp. 2d 1176, 1184 (10th Cir. 2009) (internal citations and quotations omitted).  However, that standard is in the context of motions to strike pursuant to Fed. R. Civ. P. 12(f) (the Court may, on its own or by motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter"), which rule refers to pleadings.  In the summary judgment context, however, the Tenth Circuit has also stated that parties "[o]ften" object "to the personal knowledge of a witness's affidavit or declaration" by moving to strike.  *Hancock v. American Tel. and Tel. Co., Inc.*, 701 F.3d 1248, 1262 (10th Cir. 2012).  The Court will therefore address the Plaintiff's motion to strike on its merits.

As to Defendant DiNapoli's 3.5-page introduction section to his motion for summary judgment, the Plaintiff contends it should be stricken because this Court's L.Civ.R. 56.1(b) states, "The brief in support of a motion for summary judgment (or partial

summary judgment) shall begin with a section stating the material facts to which the movant contends no genuine dispute exists. The facts shall be set forth in concise, numbered paragraphs." Defendant DiNapoli's numbered paragraphs begin following this 3.5-page introduction section. However, under this Court's local rules, a moving party may *also* combine a motion and brief in one document provided it is "clearly stated in the title of the motion," *see* L. Civ. R. 7.1(b), which the Defendant did in this case. Here, the introduction section can be attributed to the motion, with the enumerated section beginning the brief. As the introduction section simply reduced the length of brief overall for Defendant DiNapoli, and the undisputed facts were determined based on the enumerated paragraphs as outlined by the parties, the Court declines to strike this section.

As to Mr. Tipton's report, the Court notes that "at summary judgment stage, parties need not present evidence in admissible form, so long as it can show that the evidence can be admitted at trial." *Rawers v. United States*, 488 F. Supp. 3d 1059, 1105 (D.N.M. 2020). Furthermore, "[e]ven if a party initially submits an unsworn affidavit or declaration to substantiate a claim under rule 56, if a party attaches an unsworn expert report along with an expert's sworn declaration or deposition affirming the report, the unsworn report's deficiencies are cured." *Id.* As part of his response to the Plaintiff's above-mentioned Motion to Strike, Defendant DiNapoli has filed a motion requesting leave to file an affidavit from expert witness Timothy Tipton as a supplemental exhibit, in which he states that Mr. Tipton will testify to the statements in his report. Defendant DiNapoli offers this affidavit to correct the unsworn statement submitted in Mr. Tipton's report as an exhibit to his pending motion for summary judgment and attached it as an exhibit to the motion for

the Court's review.  *See* Docket No. 76, Ex.1.  The Plaintiff opposes the motion as untimely, asserts that the report contains inadmissible opinions, and contends that he has already responded to the summary judgment motion as drafted and additional exhibits would prejudice him.  The Court finds that allowing Defendant DiNapoli to file this supplemental exhibit would not be prejudicial to the Defendant, and Defendant DiNapoli's Motion for Leave to File a Supplemental Exhibit to Defendant's Motion for Summary Judgment [Docket No. 76] is hereby granted.  Defendant DiNapoli is directed to file the supplemental exhibit forthwith.

As to the recorded statement of Mr. Current, and the portions of the County Sherriff and OSBI reports that the Plaintiff has objected to, the Court likewise declines to strike these exhibits.  As stated above, "[a]t the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'  Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form."  *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (*quoting Celotex*, 477 U.S. at 324).  "[H]owever, the content or the substance of the evidence must be admissible."  *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1122 (10th Cir. 2005).  Furthermore, "after the 2010 revisions to the Federal Rules of Civil Procedure, parties are no longer required to prepare a formal affidavit[.]"  *Rawers*, 488 F. Supp. 3d at 1104.  Here, Mr. Current is listed as a witness for the trial and Defendant DiNapoli contends that his testimony at trial would be admissible even if his statement is not.  The Court agrees and declines to strike this exhibit.

-10-

The Court likewise declines to strike the final four remaining exhibits at issue: (i) Exhibit 7, a BCSO Investigation Summary completed by BCSO Investigator Mark Riffe; (ii) Exhibit 9, an interview summary of Jerry Current; (iii) Exhibit 14, an interview summary of Mark King, a marina employee; and (iv) Exhibit 17, a BCSO Incident/Offense Report.   As to the first three exhibits, the parties have named Mr. Riffe, Mr. Current, and Mr. King as witnesses, as well as OSBI Investigator John Jones who conducted the interviews of Mr. Current and Mr. King.  Accordingly, it appears to the Court at this point that the contents of these reports could be submitted in admissible form at trial. Additionally, Defendant correctly points out that the Plaintiff has listed the fourth exhibit, the BCSO Incident Report, on his own exhibit list.  *See* Docket No. 34, p. 2.  Accordingly, the Plaintiff's Motion to Strike [Docket No. 63] is hereby denied.

The Plaintiff has also moved to strike Section III of Defendant Board's Reply Brief, asserting that the Board impermissibly raised a new argument for the first time.  *See Platt v. Winnebago Industries, Inc.*, 960 F.3d 1264, 1271 (10th Cir. 2020) ("We have held that a failure to raise an issue in an opening brief waives that issue, and that we will not entertain issues raised for the first time in an appellant's reply brief.") (internal quotations omitted). But as the Defendant Board points out, the arguments made by the Board were in response to Plaintiff's contention that the Defendant had ignored more recent relevant case law, which is permissible.  *Beaudry v. Corrections Corp. of America*, 331 F.3d 1164, 1166 n.3 (10th Cir. 2003) ("Although this court generally does not review issues raised for the first time in a reply brief, we make an exception when the new issue argued in the reply brief is offered in response to an argument raised in the appellee's brief.") (internal citations

omitted).  Accordingly, Plaintiff's Motion to Strike [Docket No. 70] is denied.

**B.  Rule 56 Standard.**

The Court first addresses the Plaintiff's contention that both motions for summary judgment violated Fed. R. Civ. P. 56 and should be denied.  The Plaintiff's responses to both summary judgment motions include identical sections asserting that the motions violated Rule 56 because they ignore facts and inferences favorable to the Plaintiff, and that each motion is nothing more than an abstraction.  *See, e. g.*, *King v. Hill*, 615 Fed. Appx. 470, 475-476 (10th Cir. 2015) ("But he presents these facts in the light most favorable to himself.  He ignores many facts and inferences favorable to Mr. King, the non-movant.  Supreme Court precedent forbids this approach.") (*citing Tolan v. Cotton*, _ U.S. _, 134 S. Ct. 1861, 1866-1868 (2014)).  But the Plaintiff points to no specific evidence in support of this general assertion of a Rule 56 violation.  Furthermore, *Tolan* is concerned with the *Court's* consideration of the evidence, and not the presentation by the parties. *Tolan*, 134 S. Ct. at 1867-1868 ("Considered together, these facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion. . . . By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, *the court below* neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.") (emphasis added).  The Court therefore finds that neither party's motion was filed in violation of Fed. R. Civ. P. 56 and will proceed to address the arguments on the merits.

-12-

**C. Defendant DiNapoli is Not Entitled to Qualified Immunity.**

The Court now turns to Defendant DiNapoli's contention that he is entitled to qualified immunity here. "'The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (*quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Additional steps are taken when a summary judgment motion raises a defense of qualified immunity." *Cunningham v. New Mexico*, 2014 WL 12791236, at *4 (D. N.M. May 12, 2014) (*citing Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right *and* (2) the constitutional right was clearly established. The court may consider either of these prongs before the other 'in light of the circumstances in the particular case at hand.'" *Cunningham*, 2014 WL 12791236, at *4 (emphasis added) (*quoting Pearson*, 555 U.S. at 236). "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, _ U.S. _, 137 S. Ct. 548, 551 (2017) (*quoting Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted). Under this standard, a Plaintiff "must identify

-13-

specific actions taken by [a] particular defendant[] that violated their clearly established constitutional rights." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013) (internal citations omitted). *See also Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011) ("§ 1983 imposes liability for a defendant's own actions—personal participation in the specific constitutional violation complained of is essential.").

Violation of a Constitutional Right.  "To state an excessive force claim 'under the Fourth Amendment, plaintiffs must show *both* that a 'seizure' occurred and that the seizure was 'unreasonable.'" *Thomas v. Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010) (emphasis in original) (*quoting Childress v. City of Arapaho*, 210 F.3d 1154, 1156 (10th Cir. 2000)). "A seizure requires the use of force *with intent to restrain*.  Accidental force will not qualify." *Torres v. Madrid*, _ U.S. _, 141 S. Ct. 989, 998 (2021).

The parties do not challenge that a seizure occurred, but neither party specifies when the seizure here actually began.  The Supreme Court stated in 1991 that "the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient [] to constitute an arrest[,] the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence." *California v. Hodari D*, 499 U.S. 621, 624 (1991) (*citing Whitehead v. Keyes*, 85 Mass. 495, 501 (1862) ("[A]n officer effects an arrest of a person whom he has authority to arrest, by laying his hand on him for the purpose of arresting him, though he may not succeed in stopping and holding him")). More recently, the Supreme Court clarified in *Torres v. Madrid* that "[t]he application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."  U.S. _, 141 S. Ct. 989, 994, 997-998 (2021) ("[W]e

-14-

see no basis for drawing an artificial line between grasping with a hand and other means of applying physical force to effect an arrest. . . . We stress, however, that the application of the common law rule does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure. A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify.") (emphasis in original). This is an objective inquiry as to "whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Id.*, 141 S. Ct. at 998 (emphasis in original). *See also Nieves v. Bartlett*, _ U.S. _, 139 S. Ct. 1715, 1725 (2019) ("To ensure that officers may go about their work without undue apprehension of being sued, we generally review their conduct under objective standards of reasonableness."). The Court therefore finds that Defendant DiNapoli's seizure of the Plaintiff began when he began punching the Plaintiff. Defendant DiNapoli first initiated a touch of the Plaintiff when grabbed the cigarette and again when he hit the Plaintiff's nose with his hat, but the Court cannot say that either of these actions objectively manifested an intent to *restrain* the Plaintiff.[3]

The next requirement, then, is for the Plaintiff to demonstrate that Defendant DiNapoli's actions were unreasonable. Here, it is important to note that "[i]n evaluating a motion for summary judgment based on qualified immunity, we take the facts 'in the light most favorable to the party asserting the injury. [T]his usually means adopting . . . the

---

[3] The Court does find, however, that Defendant DiNapoli's action with his hat, in addition to his actions in grabbing the cigarette out of the Plaintiff's hand, appeared to be an attempt to *incite* the Plaintiff.

plaintiff's version of the facts,' unless that version 'is so utterly discredited by the record that no reasonable jury could have believed him.'" *Rhoads v. Miller*, 352 Fed. Appx. 289, 291 (10th Cir. 2009) (*quoting Scott v. Harris,* 550 U.S. 372, 377, 378, 380 (2007)).  Here, the videotape of the events in question does not blatantly contradict the Plaintiff's testimony and "[t]here is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury." *Id*.  *See also Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009) ("In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party," unless Plaintiff's version is "blatantly contradicted by the record."); *Sanders v. Jersey City*, 2021 WL 1589464, at *7-8 (D.N.J. Apr. 23, 2021) ("The video does not provide a clear and complete view, however, and therefore is not conclusive.  It does not document the level of physicality and aggression from Sanders to which Otundo attested, but perhaps does not rule it out, either.").

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "Thus, in an excessive force inquiry, we ask whether the force used 'would have been reasonably necessary *if the arrest or the detention were warranted*.'"  *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (emphasis in original) (*quoting Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007)).  *See also Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (assuming "for the purposes of our independent excessive force analysis" that the defendant had committed a

-16-

crime, even though no probable cause existed to arrest for the crime.).  And it is an objective inquiry:  "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397 (internal quotations omitted).  An officer does not have to use the least intrusive means, as long as his conduct was reasonable, which is based on the totality of the circumstances.  *Thomas*, 607 F.3d at 670; *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).  Because it is based on the totality of circumstances of each case, "[r]easonableness" does not have a precise test but rather "requires careful attention to the facts and circumstances of each particular case."  *Graham*, 490 U.S. at 396.  "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed."  *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (*quoting Saucier v. Katz*, 533 U.S. 194, 205 (2001)). "[W]e are mindful:  'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'"  *Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (*quoting Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009)).

The Supreme Court in *Graham* set out several important factors, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  490 U.S. at 396.  Also, "[t]he reasonableness of Defendants' actions depends both on whether the officers were in danger at the *precise moment* that they used force and on whether Defendants' own reckless or deliberate conduct during the

-17-

seizure unreasonably created the need to use such force." *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995) (emphasis added). This "precise moment" analysis, however, must be taken into account as part of the totality of the circumstances. *See Reavis Estate of Coale v. Frost*, 967 F.3d 978, 989-990 (10th Cir. 2020) ("While the district court focused its analysis on whether Deputy Frost was in danger at the precise moment that he sued force against Mr. Coale, it did so in the context of the totality of the circumstances."). Finally, "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.

It is under this framework that the Court must asked whether the Plaintiff has proffered sufficient evidence to the extent that a rational jury could conclude that Defendant DiNapoli acted unreasonably. Defendant DiNapoli and Deputy Trainee Vawter responded to a call about trespassing, related to Mr. Raborn driving a golf cart around the marina property. According to the Plaintiff, as he was a passenger in a golf cart backing away from the officers, Defendant DiNapoli grabbed a cigarette out of his hand. The Plaintiff then got out of the golf cart and approached Defendant DiNapoli. While they were standing in close proximity, Defendant DiNapoli's hat hit the Plaintiff on the nose, Defendant DiNapoli then removed his hat and began hitting the Plaintiff with closed fists, took him to the ground, and handcuffed him. Under the Plaintiff's version of events and taking the facts in the light most favorable to the Plaintiff, the Plaintiff did not apply any force to Defendant DiNapoli's chest and therefore did not commit a crime at all, Defendant DiNapoli was the aggressor, and he never gave the Plaintiff the opportunity to submit

peacefully to an arrest. *See Casey v. City of Federal Heights*, 509 F.3d 1278, 1282 (10th Cir. 2007) ("Officer Sweet grabbed and then tackled Mr. Casey without ever telling him that he was under arrest. Nor did he give Mr. Casey a chance to submit peacefully to an arrest."). Notably, the Plaintiff testified at his deposition, "I'm not going to fight with a man a third my age that could out-perform me in every aspect that you want to mention." Docket No. 62, Ex. 1, p. 127:25-128:2. Under the totality of the circumstances as presented by the Plaintiff, therefore, the Court finds that the factors of the events weigh in favor of finding that Defendant DiNapoli's degree of force was unreasonable.

And even if the Plaintiff did apply some touch or force to Defendant DiNapoli's chest, there remains the question as to whether Defendant DiNapoli's immediate response of beating the Defendant in the chest with closed fists and taking him to the ground was reasonable under the totality of the circumstances, including the application of the *Graham* factors. *See also Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997) ("We will thus consider an officer's conduct prior to the suspects threat of force if the conduct is 'immediately connected' to the suspect's threat of force.") (citations omitted). "[Tenth Circuit] precedent recognizes that '[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Pauly v. White*, 874 F.3d 1197, 1219 & n. 7 (10th Cir. 2017) ("This has been the law in our circuit since 1995."). Applying the factors, the Defendant was not posing an immediate threat to the safety of the officers, nor was he actively resisting arrest or attempting to evade arrest. Indeed, he stood his ground

with Defendant DiNapoli while they argued.  Additionally, the evidence does not reflect that Defendant DiNapoli was acting in self-defense when he began hitting the Plaintiff with closed fists, and there are serious questions as to whether Defendant DiNapoli himself created the need to use any force in this circumstance, given his decision to grab the cigarette out of the Plaintiff's hand and to use his hat to strike the Plaintiff's face.  *Cf. Hastings v. Barnes*, 252 Fed. Appx. 197, 203 (10th Cir. 2007) ("At the moment of the shooting, Todd was advancing toward Barnes and Davis with the sword.  Thus, when Barnes and Davis shot Todd, they were acting in self-defense and, viewed in isolation, the shooting was objectively reasonable under the Fourth Amendment."  But "[t]he reasonable use of force [also depends] on whether the officers' own conduct during the seizure unreasonably created the need to use such force.") (citations omitted).

In any event, a reasonable factfinder could determine that the Plaintiff's version of events is what happened based on his testimony and the video from the marina, and that no reasonable officer would have believed that such an amount of force by Defendant DiNapoli was appropriate here.  Accordingly, the Court finds that the Plaintiff has established the first prong of the qualified immunity analysis, *i. e.*, that a constitutional right was violated.

Clearly Established Law.  Under the qualified immunity analysis, the Plaintiff must also establish that Defendant DiNapoli's actions violated a clearly established constitutional right – here, the right to be free from excessive force during a seizure.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

-20-

confronted." *Saucier*, 533 U.S. at 202 (receded from on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009)). "Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct 'by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as he maintains.'" *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016) (*quoting Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)). To be sure, "'clearly established law' should not be defined 'at a high level of generality.'" *Pauly*, 137 S. Ct. at 552 (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, it "must be 'particularized' to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (*quoting Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987)). Therefore, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (emphasis in original). *See also N.E.L. v. Douglas County, Colorado*, 740 Fed. Appx. 920, 928 n.18 (10th Cir. 2018) (noting that *Hope v. Pelzer*, 536 U.S. 730, 739-740 (2002) (finding that the "salient question" was whether the law at the time "gave respondents fair warning that their alleged treatment" violated the constitution), "appears to have fallen out of favor, yielding to a more robust qualified immunity."); *Aldaba v. Pickens*, 844 F.3d 870, 874 n.1 (10th Cir. 2016) ("We also note that the majority opinion in *Mullenix* does not cite [*Hope v. Pelzer*]. . . . In any event, the Supreme Court told us to apply *Mullenix*, so we do.").

But while the facts must be particularized, they do not have to be identical.[4]  *Ziglar v. Abbasi*, _ U.S. _, 137 S. Ct. 1843, 1866 (2017) ("It is not necessary, of course, that 'the very action in question has previously been held unlawful.'") (*quoting Anderson v. Creighton*, 483 U.S. at 640 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.")).  Indeed, "[w]hile there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate."  *District of Columbia v. Wesby*, _ U.S. _, 138 S. Ct. 577, 590 (2018) (quotation omitted).  In 2007, the Tenth Circuit stated in *Casey v. City of Federal Heights* that "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest."  509 F.3d at 1285 (*citing Graham*, 490 U.S. at 396).  "The Tenth Circuit has repeatedly held that force is unconstitutional when used against individuals [] 'who were not suspected of serious crimes, posed little to no threat, and put up little to no resistance.'"  *Estate of Holmes by and through Couser v. Somers*, 387 F. Supp. 3d 1233, 1252 (D. Kan. 2019) (*quoting McCoy v. Meyers*, 887 F.3d 1034, 1052 (10th

---

[4] The Court finds this rule to be consistent with the Tenth Circuit's recent opinion in *Frasier v. Evans*, 992 F.3d 1003 (10th Cir. 2021), which was submitted to the Court by Plaintiff as supplemental authority.  In *Frasier*, the Tenth Circuit reiterated the Supreme Court's admonition that a clearly established right must not be defined at a "high level of generality" and urged caution in applying the *Hope v. Pelzer* rule of "fair warning" only to the "rare obvious case involving extreme circumstances or particularly egregious misconduct."  992 F.3d at 1021 (*quoting, inter alia*, *District of Columbia v. Wesby*, _ U.S. _, 138 S. Ct. 577, 590 (2018).

Cir. 2018)).  Under Plaintiff's version of the facts, which are credited at this stage of the case, the Plaintiff was not even a misdemeanant and therefore his right to be free from a forceful takedown was clearly established.  *See, e. g.*, *Morris v. Noe*, 672 F.3d at 1198 ("Noe had reason to believe Morris was, at most, a misdemeanant.  But Morris posed no threat to Nor or others, nor did he resist or flee.  Thus, based on the facts assumed by the district court, Morris's right to be free from a forceful takedown was clearly established under *Graham*.").  *See also McCoy*, 887 F.3d at 1049 ("*Dixon* [*v. Richer*, 922 F.2d 1456 (10th Cir. 1991)], *Casey*, and *Weigel*[*v. Broad*, 544 F.3d 1143 (10th Cir. 2008)] involved force used on individuals who either did not pose a threat to begin with or were subdued and thus no longer posed any threat.") (*citing, inter alia*, *Casey*, 509 F.3d at 1282 (holding that the defendants' alleged use of force was excessive where the plaintiff was 'suspected of innocuously committing a misdemeanor' and 'was neither violent not attempting to flee.")).  And although the *Osterhout* decision was issued after the incident in this case, it is important to note that the Tenth Circuit cited *Casey* again in 2019, reiterating, "[t]hus, we have concluded force was unconstitutional when it was used against plaintiffs, like Mr. Osterhout, 'who were not suspected of serious crimes, posed little to no threat, and put up little to no resistance.'"  *Osterhout v. Morgan*, 763 Fed. Appx. 757, 764 (10th Cir. 2019) (*quoting McCoy*, 887 F.3d at 1052 n.21) (*citing Casey*, 509 F.3d at 1282-1283, 1286; *Morris v. Noe*, 672 F.3d at 1190, 1195-1196; & *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1309-1310, 1315 (10th Cir. 2002)).

The Court thus concludes that it would have been obvious on May 26, 2018 to Defendant DiNapoli that it was unconstitutional for him to use violent force on the Plaintiff

who was not resisting arrest or attempting to flee, and there was no objective reason to believe he posed an imminent threat to the responding officers or to the public.  The Plaintiff has therefore established a violation of his clearly established constitutional rights, and genuine issues of material fact remain as to what happened in this case.  Because these issues of fact are in controversy and affect the qualified-immunity analysis, the Court finds that summary judgment is inappropriate as to Defendant DiNapoli and declines to dismiss Plaintiff's claim of excessive force on the basis of qualified immunity.

### D.   The Board is Not Entitled Summary Judgment.

The Board has also moved for summary judgment, asserting that Defendant DiNapoli acted outside the scope of his employment, and that the Board is exempt from liability under the terms of the Oklahoma Government Tort Claims Act ("OGTCA"). "Under Oklahoma law an employer may be liable for an employee's intentional torts if the employee was 'acting within the scope of the employment in furtherance of assigned duties.'" *Barnes v. United States*, 707 Fed Appx. 512, 517 (10th Cir. 2017) (*quoting Bosh v. Cherokee Cty. Bldg. Auth.*, 2013 OK 9, ¶ 9, 305 P.3d 994, 998 (superseded by statute on other grounds).  "Under the theory of *respondeat superior,* one acts within the scope of employment if engaged in work assigned, or if doing that which is proper, necessary and usual to accomplish the work assigned, or doing that which is customary within the particular trade or business." *Tuffy's, Inc. v. City of Oklahoma City*, 2009 OK 4, ¶ 7, 212 P.3d 1158, 1163.

> The [O]GTCA defines a "tort" as a legal wrong involving a violation of a duty imposed by general law or otherwise resulting in a loss as the proximate result of an act or omission of a political subdivision or employee acting

> within the scope of employment. "Scope of employment" is defined as performance by an employee acting in good faith within the duties of his office or employment or of tasks lawfully assigned by a competent authority. Except in cases where only one reasonable conclusion can be drawn, the question of whether an employee has acted within the scope of employment at any given time is a question for the trier of fact. An employee of a political subdivision is relieved from private liability for tortious conduct committed within the scope of employment. A political subdivision is relieved from liability for tortious conduct committed by employees outside the scope of employment.

*Tuffy's*, 2009 OK 4, ¶ 8, 212 P.3d at 1163. *See also Nail v. City of Henryetta*, 1996 OK 12, ¶ 11, 911 P.2d 914, 917 ("Oklahoma law recognizes the applicability of the doctrine of respondeat superior to the Governmental Tort Claims Act. Under the theory of respondeat superior, one acts within the scope of employment if engaged in work assigned, or if doing that which is proper, necessary and usual to accomplish the work assigned, or doing that which is customary within the particular trade or business.")

The Oklahoma Supreme Court has said:

> As a general rule, it is not within the scope of an employee's employment to commit an assault upon a third person. However, this general rule does not apply when the act is one which is fairly and naturally incident to the business, and is done while the servant was engaged upon the master's business and be done, although mistakenly or ill advisedly, with a view to further the master's interest, or from some impulse of emotion which naturally grew out of or was incident to the attempt to perform the master's business. An employee's act is within the scope of employment if it is incident to some service being performed for the employer or arises out of an emotional response to actions being taken for an employer. It is the burden of the plaintiff to show that the employee was acting within the scope of his employment.

*Rodebush by and through Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, ¶ 12, 867 P.2d 1241, 1245 (internal quotations and citations omitted). The Oklahoma Supreme Court has therefore adopted a test stating that "'liability exists for acts of officers

-25-

that can be described as abuses of lawful power,' but not for 'an unlawful usurpation of power the officer did not rightfully possess.'  The line between abuse and usurpation is not the line between legal and illegal acts.  An 'officer's misconduct, though illegal,' may be 'accomplished through a[n] abuse of power lawfully vested in the officer.'"  *Barnes*, 707 Fed. Appx. at 517 (*quoting DeCorte v. Robinson*, 1998 OK 87, ¶ 12, 969 P.2d 358, 361-362) (*quoting McGhee v. Volusia Cty.*, 679 So.2d 729, 733 (Fla. 1996)).  *See also Lampkin v. Little*, 286 F.3d 1206, 1213 (10th Cir. 2002) ("We also note that the inquiry into whether the employee acted in good faith for purposes of the scope of employment and the inquiry into whether the employee acted in good faith in committing particular acts are not identical.") (*citing, inter alia, DeCorte*, 1998 OK 87, ¶ 14, 969 P.2d at 362).  However, "[t]he question of whether an employee has acted within the scope of employment at any given time is normally a question for the jury, except in cases where only one reasonable conclusion can be drawn from the facts."  *Nail*, 1996 OK 12, ¶ 13, 911 P.2d at 918.

Here, the Court finds that whether Defendant DiNapoli was acting within the scope of his employment is a question of fact for the jury to decide.  It will be for a jury to determine whether his actions "constituted an abuse of power lawfully vested in him" or an "unlawful usurpation of power" he did not possess.  *Barnes,* 707 Fed. Appx. at 514 ("As we understand Oklahoma respondeat superior law, McFadden's torts against Ms. Barnes may have been within the scope of his employment. A factfinder could reasonably decide that his perjury and other misconduct constituted an abuse of power lawfully vested in him rather than an 'unlawful usurpation of power the officer did not rightfully possess,' and that his motives included serving a government purpose.") (*quoting DeCorte*, 969 P.2d

at 362). *See also DeCorte*, 1998 OK 87, ¶ 14, 969 P.2d at 362 ("The pursuit of DeCorte, the stopping of DeCorte and approach by Robinson, the arrest, the choke hold, and the later alleged assault and battery did not happen in a single instance, but took place over a period of time.  In *Nail*, we contemplated a situation in which an officer's initial actions were within the scope of employment, but that during the unfolding of events his actions may have gone beyond that scope. Such is the case here. Robinson's initial actions may well have been taken on behalf of his employer, and been within the scope of his duties. However, the jury obviously determined that during the course of events his actions exceeded that scope. While we agree with the City's assertion that an individual cannot simultaneously act in good faith and in a malicious manner, the jury was clearly justified in finding that at some time during the episode Robinson went beyond the bounds of good faith.") (*citing Nail*, 1996 OK 12, ¶¶ 11-14, 911 P.2d at 917).  *Cf. Gowens v. Barstow*, 2015 OK 85, ¶ 22, 364 P.3d 644, 654 ("There is no indication that his actions, although having been found unreasonable under the circumstances, were so extreme that they unlawfully usurped any power he did not rightfully possess as an emergency vehicle driver.").  The Court therefore finds that the Board is not entitled to summary judgment at this stage.

## CONCLUSION

Accordingly, the Defendant Michael DiNapoli's Motion for Summary Judgment and Supporting Brief [Docket No. 48] is hereby DENIED, and the Defendant Board of County Commissioners of Bryan County's Motion for Summary Judgment and Brief in Support [Docket No. 44] is hereby DENIED.   Furthermore, it is the order of this Court that Plaintiff's Motion to Strike [Docket No. 63] and Plaintiff's Motion to Strike [Docket

No. 70] are hereby DENIED.  Finally, Defendant DiNapoli's Motion for Leave to File a Supplemental Exhibit to Defendant's Motion for Summary Judgment [Docket No. 76] is hereby GRANTED.

DATED this 20th day of August, 2021.

_____

**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**